IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 7, 2011

IN RE CARLIE G. C.

Appeal from the Juvenile Court for Johnson City
No. 37,074    Sharon M. Green, Judge

No. E2010-01501-COA-R3-PT - Filed March 30, 2011

Philip C. ("Father") appeals from the termination of his parental rights to his minor child, Carlie G. C. ("the Child"), who was five years old at the time of trial. The court found, by clear and convincing evidence, that statutory grounds for termination exist and that termination of Father's parental rights is in the best interest of the Child. Father appeals and challenges the trial court's findings. We affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Brandy Boyd Slaybaugh, Knoxville, Tennessee, for the appellant, Philip C.

Casey A. Sears, II, Johnson City, Tennessee, for the appellees, Jessica B. and Brandon G. B.

Lissette Tant, Johnson City, Tennessee, Guardian Ad Litem for Carlie G. C.[1]

OPINION

---

[1]The Guardian Ad Litem has filed a statement in which she joins in and adopts the brief filed by the appellees.

I.

Initially, the trial court terminated Father's rights at the conclusion of a March 2010 bench trial. One week later, the court, on its own motion, entered an order vacating its ruling. The court did so because no guardian ad litem had been appointed to represent the interests of the Child. The court noted that "the appointment of a [g]uardian [a]d [l]item in a contested termination of parental rights case is not a matter that may be waived." The court then returned the case to its docket, appointed a guardian ad litem, and set the case for hearing on April 29, 2010. At the time of trial, Father was 45 and in good health. Although he had a steady employment history, he was then unemployed, but earned money from "side jobs" and was training to become a firefighter.

The Child was born to Jessica L. B. ("Mother") and Father, an unmarried couple, on October 20, 2004. By that time, Mother and Father had lived together in Key West, Florida for two years. Mother was employed as an "exotic dancer" and Father had worked steadily at various jobs, most recently as a supervisor for Home Depot. In November 2004, the Child was not yet a month old when the family traveled to Puerto Rico to visit Father's relatives. On their return trip, only one seat was available on their planned flight. For this reason, Father returned home to Florida with all their luggage while Mother and the Child stayed a few more days in Puerto Rico. Afterwards, the Child's maternal grandmother was eager to see them, so Mother and the Child flew to Tennessee to spend Thanksgiving with Mother's family. As it turned out, Mother and the Child would not return to Florida but rather relocated permanently to Tennessee. Mother and Father continued to communicate, but Father remained in Florida and had no further contact with the Child.

Father acknowledged that Mother repeatedly asked him to move to Tennessee to live with her and the Child, but he declined. Father said that he was willing to move, but not until he had saved some money. When this was accomplished, according to him, he would consider relocating to Tampa, not to Tennessee. Mother began asking Father to help support the Child, but, according to her, he felt the Child was already being cared for and refused her requests for money. At the same time, the paternal grandmother, Nilda C., and Father's sister, Gisselle C., ("Grandmother" and "Aunt," respectively), always sent a package with presents and a check for $50 or $100 for the Child on her birthday and at Christmas each year. Mother told Father and his family members that she "really needed help making ends meet, not toys or gifts" and invited them to contribute to an account she had set up for the Child's benefit. When the Child was about three, Father began to send some checks to Mother indirectly through Grandmother. He also sent a box of presents that he purchased himself, including a bicycle and a video game for the Child's third birthday.

Eventually, the long-distance "relationship" deteriorated. Mother noted it became

-2-

particularly strained after she kept asking Father to provide her with his new address in an effort to obtain child support and he always refused. Mother said in November 2005, after Father "threatened" to use her background as a stripper to take the Child from her, she filed a petition seeking custody and other relief in the Greene County Juvenile Court. Following a hearing at which Father did not appear, Mother was granted sole custody. Based on the Child's birth certificate from the state of Florida, the Greene County court recognized Father as the Child's biological father and ordered that visitation would be permitted only under certain conditions outlined in the order – essentially, that Father subject himself to the court's jurisdiction and establish to the court's satisfaction that he had a suitable place for visitation to occur, a lawful source of income to provide for the Child, and the requisite skills to parent the Child. Further, the Child's name was changed to reflect Mother's surname. The court deferred entry of a child support order "until such time as jurisdiction exists for that purpose."

According to Mother, since she and Father were still speaking, she called after the custody hearing and advised him of the conditions for visitation and the Child's name change. She said Father commented only that the Child would always have his name. At trial, Father denied knowledge of the hearing[2] or the resulting order, but acknowledged that he had recently resided at one of the two addresses to which the order was sent. Father admitted that he was aware of his right to visit the Child, that he had Mother's telephone numbers, and that he knew where Mother lived (with her mother) in Tennessee having visited that same residence with Mother before the Child was born. Father acknowledged that Aunt was a manager for an airline company and could obtain tickets for friends and family that would have allowed Father to fly to Tennessee at a greatly-reduced fare.

Over the years, Mother maintained a friendly relationship with Grandmother and Aunt and permitted them to talk with the Child. Then, in November 2008, when the Child was four, Mother sent a text message to Aunt requesting that Aunt and Grandmother refrain from sending any more "gifts" to the Child because, Mother said, she was now living with "a good man" and would not accept them. The following month, Mother informed Aunt that if she still wanted to send the Child a Christmas gift, she could make a deposit to a college fund she intended to establish. Mother said the last package she received from Aunt and Grandmother came around the Child's birthday, in October or November 2009; it contained 5 outfits for the Child but no check. Aunt agreed that Mother had never instructed her to stop sending money for the Child. Since the termination case was pending, Mother thought it best to stop

---

[2]The November 15, 2005, "Order for Custody and Other Relief" reflects that Mother's custody petition was served on Father "pursuant to Tenn. R. Civ. P. 4.05(5) (certified return receipt mail restricted to addressee which was 'refused' by Father). . . ." and that Mother's application for default judgment was also served on Father.

all communications with Aunt and Grandmother.

According to Father, he took no legal action with respect to the Child in the first years after Mother left him because he was focused on saving their relationship. He emphasized at trial that he never intended to take the Child away from Mother or to raise her himself, and that he only wanted to be part of the Child's life. During their earlier conversations, Father asked to speak with the Child, but "kept on getting denied." In the year to a year and a half before trial, Father and Mother ceased talking and Father had directed Mother to communicate with him through Grandmother. In January 2009, Father retained an attorney in Florida who wrote a letter to Mother urging that she begin facilitating visitation between Father and the Child. The letter advised that Father would be forced to take "court action" if Mother did not respond within 15 days. Mother saw the letter as another "empty veiled threat" and not as a serious effort by Father to establish a relationship with the Child. At the same time, she welcomed the possibility of going to court as a means of securing child support. Mother did not respond to the letter and Father did not pursue a court action for visitation, because, according to him, he could not afford to pay his attorney any more money. Father denied that Mother ever asked him for his address; he explained that she knew he was "on the road" working and he had told her to contact Grandmother if she needed to reach him.

In June 2009, Mother married Brandon G. B. ("Stepfather"). Mother, Stepfather and the Child had lived together as a family since March 2009. On November 20, 2009, Stepfather, joined by Mother, filed the petition to terminate Father's rights that is the subject of the instant case. Therein, Stepfather alleged that he had developed a "father-child" relationship with the Child, provided for all of the Child's needs since he and Mother married, and intended, with Mother's consent, to adopt the Child as his own if the petition was granted.

On June 10, 2010, the juvenile court ordered Father's parental rights terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(1)(Supp. 2009) on the grounds of abandonment by failure to visit and failure to support the Child. Father filed a timely notice of appeal.

II.

Father raises two issues for this court's review. For clarity, we restate and address them as follows:

> 1. The trial court erred in finding that grounds for termination were proven by clear and convincing evidence.

-4-

2. The trial court's best interest analysis is insufficient to comply with Tenn. Code Ann. §§ 36-1-113(c)(2) and (k) and the limited scope of its analysis renders the statutory framework for any petition to terminate a "legal fiction."

III.

We employ the following standard of review in cases involving the termination of parental rights:

> [T]his Court's duty. . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

***In re F.R.R., III***, 193 S.W.3d 528, 530 (Tenn. 2006).

The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. ***Id***.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See **Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. ***Langschmidt v. Langschmidt***, 81 S.W.3d 741, 744-45 (Tenn. 2002).

It is well established that parents have a fundamental right to the care, custody, and control of their children. ***Stanley v. Illinois***, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); ***In re Drinnon***, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See **Blair v. Badenhope***, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." T.C.A. § 36-1-113(c)(Supp. 2007); ***In re F.R.R., III***, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, ***State v. Demarr***, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed Aug. 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. ***In re Valentine***, 79 S.W.3d at 546; ***In re S.M.***, 149

-5-

S.W.3d 632, 639 (Tenn. Ct. App. 2004).

IV.

A.

Father asserts that the proof at trial failed to establish that he willfully abandoned the Child by failing to visit or support her. On the contrary, he argues, "Father's behavior was not willful and Father never evinced a settled purpose to forego all parental duties and relinquish all parental claims even where the Petition failed to present proof of Father's ... paternity." Father concedes that he has "incontrovertibly failed to visit his [C]hild." However, he attributes his admitted failure in this regard to Mother, charging that she initially absconded with the Child and then alienated him to prevent a Father/Child relationship. Father asserts that his willful failure to support the Child was also unproven.

B.

The trial court terminated Father's rights on grounds that he abandoned the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(1)(2005). The statute provides, in relevant part, as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection.
> . . .
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

In turn, Section 36-1-102(2007), referenced above, outlines the ground of abandonment in relevant part as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment'" means that:
>
> * * *
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the

-6-

parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child. . . .

Under subdivision (1) of Section 36-1-102, "'willfully failed to visit' means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation," and "'willfully failed to support' or 'willfully failed to make reasonable payments toward such child's support' means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(D) and (E). In the present case, the relevant four-month statutory period for establishing either form of abandonment – failure to visit or failure to support – spans from July 20, 2009 to November 20, 2009, the date the termination petition was filed.

C.

We first consider whether the trial court erred in finding that Father abandoned the Child pursuant to Section 36-1-113(g)(1) by failing to visit. In concluding that this ground was established by clear and convincing evidence, the trial court made extensive findings that we quote as follows:

> Father's testimony was that for the first two years following the parties' separation, he was more concerned about his relationship with Mother and they had many telephone conversations following the separation. From Father's demeanor during the trial, the separation was obviously a very painful experience for him. Father knew where Mother was residing and had been there before. Mother frequently asked Father to come to Tennessee. Mother testified that when Father asked to speak with the [C]hild, she did not feel comfortable with him simply telling the [C]hild that he was her father over the phone without [F]ather planning to visit the [C]hild and to establish a more substantial relationship with the [C]hild.
>
> Mother testified that Father threatened to take the [C]hild from her, using her prior employment as an exotic dancer against her. Mother testified that she sought legal counsel and obtained an

-7-

Order from the Greene County Juvenile Court, granting her custody of the [C]hild and prohibiting Father from visiting with the [C]hild until he met certain requirements.

\*    \*    \*

Although this Court makes no finding as to the validity of the conditions in the . . . Order which Father was required to meet prior to visiting with his [C]hild, Father testified that he was not aware of the Order. The Court cannot interpret the mere existence of the Order, without Father's knowledge, as negating the willfulness of his failure to visit.

Father was aware that he had the legal right, as the [C]hild's father, to visit with the [C]hild. He retained an attorney in Florida to assist him in setting up visitation with his daughter. The letter advised Mother that "if you do not respond within fifteen (15) days, that [Father] will be forced to take court action in this matter." Father, therefore, was also aware of his right to initiate legal action to enforce his rights although he took no further steps.

Father had the financial means by way of his sister's employment with American Airlines to travel by air at an extremely reduced rate into the Knoxville Airport to visit with [the Child]. . . ." Considering Father's income and the amount of his fixed monthly expenses during the relevant time period, Father had the financial ability to visit with the [C]hild. There was no evidence presented that Father visited, attempted to visit, or attempted to contact Mother concerning visitation or concerning the health and well-being of the [C]hild during the four consecutive months preceding the filing of the petition . . . .

\*    \*    \*

The Court is of the opinion and so holds that Father has willfully failed to visit the [C]hild, that Father was aware of his duty to visit, had the capacity to do so, made no attempt to do so within the [relevant] four consecutive months . . ., and has no

justifiable excuse for not doing so. The Court . . . further . . . holds that Father's failure to visit is willful and that Mother's conduct did not amount to a significant restraint of or interference with Father's minimal efforts to visit with the [C]hild.

The evidence does not preponderate against the trial court's findings. Again, it is undisputed that Father did not visit the Child during the relevant four months; in fact, the Child was nearly six years old at trial and when Father last saw her she was a month-old newborn. Accordingly, the issue boiled down to a question of whether Father's failure to visit was willful. On our review of the record, we conclude that the trial court correctly resolved this issue against Father. The evidence showed that the extent of Father's efforts to visit the Child was retaining an attorney in 2009 to urge Mother to arrange visitation. As the trial court found, when Mother did not reply to the letter, Father did not carry through with his "threat" to pursue visitation through the courts or on his own. In this regard, the extent of Mother's "alienation" of the Child from Father, as Father described it, was to deny Father phone conversations with the then four-year-old Child until Father had made a plan to visit and spend time with her in person. In our view, Mother did not thereby thwart, but actually encouraged, even required, that Father visit and spend time with the Child rather than leaving Mother without answers to the questions that would naturally follow after a man that the Child had no memory of "introduced" himself as her father over the phone. Father did not explain his failure to take advantage of his access to discounted airfare to come to Tennessee other than testifying to his baseless claim that Mother could have him incarcerated if he had tried to visit the Child.

In short, the evidence clearly and convincingly established Father's willful failure to visit the Child. The juvenile court did not err in terminating his rights on this ground.

D.

We next consider whether there was clear and convincing evidence to support the trial court's conclusion that Father abandoned the Child by willfully failing to support her. Father essentially argues that neither his ability to pay nor his duty to pay were proven at trial. However, laying that position aside, he also asserts that he paid regular child support and paid support during the four months immediately preceding the filing of the termination petition.

In support of its determination of willful failure to pay child support, the trial court set out its detailed findings as follows:

Father and [Grandmother] testified they used a cumbersome system for payment of child support. According to Father, he deposited money into a[] bank account in Florida, called [Grandmother] in Puerto Rico, and told her to send a check to Mother. [Grandmother] withdrew the funds using an ATM card, deposited the funds into her account, and sent a check to Mother. The evidence is clear that no more than $725.00 was sent to . . . Mother through this cumbersome process during the four *years* prior to the filing of the Petition to Terminate . . . , none of it within the four consecutive months immediately preceding the filing of the Petition. Father's testimony that he sent child support to . . . Mother, in an amount greater than the cancelled checks filed as exhibits in this cause during the four (4) *years* preceding the filing of the petition, is not credible. Father's testimony that he tried to send money every month or every other month is not credible. Father's testimony that he sent $200.00 for the [C]hild in November, 2009, is not credible. The duplicate copy of [Grandmother's] (uncashed) check was dated December 20, 2009, one month after the Petition to Terminate . . . was filed.

Mother's testimony that the total amount of money which she received from either Father or his family members, during the years prior to the filing of the Petition . . . was "at most" $1,000.00 is credible.

There is no proof of any payment of child support during the relevant four (4) month period . . . . [Father] had over three months to prepare for trial, yet produced no records other than the checks for $725.00.

The Court finds by clear and convincing evidence that Father did not send any payments of child support between July 20, 2009, and November 20, 2009. His testimony to the contrary is not credible.

Father is a healthy 45 year old man. He has had a history of prior employment in the public sector and as being self-employed. He is currently drawing unemployment benefits of $275.00 each week and has been doing "side jobs", such as

cutting grass and building decks for cash. When asked about his living expenses, Father testified that he shared a home with fire fighters and that his monthly living expenses were approximately $525.00, not including food and occasional transportation. Father's income exceeds his living expenses by several hundred dollars each month, not including income derived from "side jobs". Father's testimony revealed that his employment and financial position has remained the same for the past year and a half, which encompasses the critical four month period.

Mother requested Father to give her his current address in Florida multiple time so that she could pursue obtaining an Order of child support against him. Father refused on multiple occasions. The Court finds that the only plausible reason for the cumbersome method of depositing money into . . . [F]ather's account, notifying [Grandmother], her withdrawing the funds with an ATM, and then mailing a check to Mother was to prevent Mother from having Father's address for pursuing a child support Order against him.

The Court finds that Father's failure to pay child support during the four months preceding the filing of the termination petition was willful and intentional. The Court finds that there is clear and convincing evidence that Father was aware of his duty to support, had the ability to pay child support during the [four month period], made no attempt to do so, and has no justifiable excuse for not doing so.

. . . Mother did not significantly restrain or interfere with Father's efforts to support his [C]hild. There is no evidence that Mother hid her address so that child support could not be mailed to her or that she returned or failed to cash any checks or gifts prior to the filing of the Petition . . . .

\* \* \*

The checks which were mailed to Father after the petition was filed do not constitute support within the statutory time frame.

(The word "years" is emphasized in original.)

In addressing whether the failure to support a child is willful, this court has observed:

> Failure to provide support is willful if the parent is aware of his or her duty to support, is capable of paying support, makes no attempt to provide support, and has no justifiable excuse. Willful conduct is intentional or voluntary; often, intent must be inferred from circumstantial evidence. Willfulness is a question of fact that the trial court is in the best position to make.

*In re W.B.*, Nos. M2004-00999-COA-R3-PT and M2004-01572-COA-R3-PT, 2005 WL 1021618 at *8-9 (Tenn. Ct. App. M.S., filed April 29, 2005) (internal citations omitted). To the extent that a consideration of the evidence requires the trial court to assess the credibility of the witnesses, we proceed with deference to the court's assessment. The "weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact . . . ." *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995).

In the present case, the evidence at trial preponderates overwhelmingly in support of the trial court's finding that Father willfully failed to support the Child. The proof showed that Mother repeatedly asked Father for child support but was unsuccessful in obtaining money from him or even his address so that she could pursue a court action. Mother emphatically denied ever telling Father or anyone in his family not to send money and the court credited her testimony in this regard. Mother added that even though she made Father aware that she and the Child were being supported by her family and through public assistance – food stamps and TennCare medical insurance – he refused to send her any money directly and once even denied a particular request for $20 to help buy diapers. Mother noted that she also pursued collection of child support through the Child Support Division in Tennessee, but they were without the resources to help her because Father lived outside the state and Mother could not provide his address. The court found that Father's testimony that Mother never once asked him for his address was not credible.

The proof established that Father eventually sent some money to Mother through Grandmother. Grandmother presented evidence showing that between October 2007 and February 2009 she sent Mother six checks for the Child "from Daddy" that totaled $725. The last of these checks was in the amount of $100.00 and dated February 7, 2009. According to Grandmother, she sent Mother another check in October 2009, within the relevant four-month period, but Mother denied receipt of a check in that time period and Grandmother presented no evidence of such payment. Similarly, Father's assertion that he sent a payment

in November 2009 was also unsupported.

The record further reflects that after the termination petition was filed, Grandmother sent a last check dated December 20, 2009, that Mother never cashed. As with much of Father's testimony regarding child support, the trial court discredited Father's testimony (1) that he had sent money "every month or at least every other month" and (2) that there were "many more checks out there" than those presented at trial. Although Father disputes the trial court's finding that he sent nothing during the four months immediately preceding the filing of the termination petition, he could not explain his lack of evidence of other payments. Father also provided little explanation for why he found it necessary to use the "cumbersome" method – as the court described it – of sending money to Mother via Grandmother in Puerto Rico. Notably, despite his assertion that he was not permitted to have a checking account because he owed some charges on an old account – another assertion that the court did not find credible – Father was able to open an account and sent two checks directly to Mother just before trial. On questioning by the court, Father testified as follows:

> The Court: . . . . And this account that your mother has the ATM card for.
>
> [Father]: Yes.
>
> The Court: Now, does she have an ATM card for that account?
>
> [Father]: For that account. It was my son, Jordan's account.[3]
>
> \* \* \*
>
> [Father]: . . . . [I]t was just a vacant account that I had so I decided at that point to use it to send – it was easier for me to send money to mom who is in Puerto Rico. All she had to do was just go to the ATM card machine and take out money and she needed it for whatever reason.
>
> The Court: . . . . It was that you were sending it or was she actually withdrawing that ATM money?
>
> [Father]: She could take money out of Jordan's account.

---

[3]Father testified that he had another child from a previous relationship.

* * *

The Court: So I guess I don't understand what it is about you – from you know, sending you[r] money. If she could just withdraw it, why --

[Father]: I guess that's the form of sending it to her?

The Court: I don't know. That's what I'm asking, I don't understand –

[Father]: That's how she would receive money from me is she would go into his account and I would deposit money into Jordan's account and –

The Court: Then you would tell [Grandmother] to go withdraw it?

[Father]: Right. And then she would send it to [the Child] for whatever she needed – wanted to buy clothes for [the Child] whatever. [Grandmother] is on social security, she doesn't have a lot of money so –

The Court: Okay.

[Father]: Whatever she needed. If she had money on her own to buy [the Child] things, she would do that. But then I would always tell her, tomorrow I'll pay $100 or 200 if I came across some money, you know.

The Court: So when did that account close?

[Father]: That account closed I'd say within the last six months.

The Court: Did you get statements from that account?

[Father]: No, for what?

The Court: From the bank.

-14-

[Father]: No, I never got statements from the bank. You know I got statements in the mail from the bank but not –

The Court: Yeah. The statements that you got in the mail from the bank showing the activity on that account.

[Father]: I threw them away.

The Court: Okay.

[Father]: . . . [T]hat wasn't an account that I needed so – I didn't know I was going to be in a courtroom, I just --

The Court: Okay. Did you think to go to that bank and say that you need copies of that account for --

[Father]: For this? For going to court? It didn't even occur to me to do that. What I did, I wound up opening up a checking account in my name, . . . .

The Court: I understand.

[Father]: Because it was a big deal of me sending money so I decided --

The Court: I understand.

[Father]: That's the only reason I opened up this checking account is so that – to show you that, you know–

On our review of the evidence, we conclude, as did the trial court, that Father was unable to offer any valid reason why he did not simply send checks directly to Mother or why he had no record of further payments he allegedly sent. The court's conclusion that it was nothing more than Father's calculated effort to deny Mother knowledge of his address and the ability to pursue court-ordered child support is logical. In any event, the court found that Father demonstrated that he paid a total of $725 in support over five years and none during the four-month statutory period.

Father's testimony indicated that during this same time, and for the past year and a half before trial, he was enrolled in school and received $275 a week in unemployment. In

addition, Father said he would "hustle" side jobs whenever he could. His expenses averaged only $525 a month plus food and limited transportation costs; he shared a house with a roommate and did not own a car. Father admitted that he had twice traveled to Puerto Rico but never came to Tennessee until trial. On our review, we conclude that the evidence clearly and convincingly supports the trial court's finding of Father's willful failure to support the Child.

Lastly, in a two-paragraph argument, Father, seemingly for the first time in this case, suggests that his *duty* to support the Child was never established because the record contains no parentage order or other document defining his rights and obligations to the Child. Father asks: "Does the mere belief of both parties of the parentage of this [C]hild establish said duties to a clear and convincing standard," and concludes "it cannot." As we understand his argument, Father does not question his paternity of the Child. Rather, he contends only that the record before us lacks any document legally confirming his parentage. Hence, Father reasons, his duty of support has not been shown and cannot support the termination of his rights.

We think this argument is easily resolved based on Father's admissions that he is the Child's father. First, upon being served with the termination petition, Father in his pro se response asserted: "I want to respectfully inform the court that I have no intention to surrender my parental rights of (sic) my daughter, Carlie [G.][C.] at this time or ever in the future." In his subsequent answer, filed through counsel, Father admitted the specific allegation that he "is the father of Carlie [G.][C.]." At trial, Father was asked, "[W]hat is your relationship to Carlie [G.][L.]?"[4] Father responded, "I am her father." He continued, "I was there since day one when she was just a twinkle in [Mother's] eye." Given Father's multiple, unequivocal admissions of his parentage of the Child, we conclude that his entire argument on this point is nonsensical at best. In short, we think it goes without saying that an admitted fact – in this case, Father's parentage of the Child – need not be established by further proof at trial. It follows that Father's duty of support was also established. "In Tennessee, biological parents are expected under the common law to understand, even in the absence of a court order, that they have an obligation under the law to support their children if they have the ability to do so." ***In re Adoption of Kleshinski***, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *18 (Tenn. Ct. App. M.S., filed May 4, 2005)(citing ***Smith v. Gore***, 728 S.W.2d 738 (Tenn. Ct. App. 19867)).

_____

[4]The "L." represents the change of the Child's last name to reflect Mother's maiden name before she married Stepfather.

V.

In challenging the best interest analysis, Father contends that the trial court improperly considered only three of the nine statutory factors. He complains that these three factors were "simply an echo of the statutory grounds" already proven in support of termination. As Father sees it, under such a "limited" examination of best interest, it would be virtually impossible for the decision to go in his favor. Father concludes that the best interest determination must be vacated and the case remanded for further findings. We disagree.

The factors relevant to a best interest analysis are set forth in Tenn. Code Ann. § 36-1-113(i). That section provides:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child,

or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In the present case, the trial court set out its best interest analysis as follows:

The relevant factors, to the facts of this case are (3), (4), and (9). The third factor, maintaining regular visitation or other contact with the [C]hild, has been thoroughly examined . . . . The Court finds by clear and convincing evidence that there has been no father-daughter visitation since the [C]hild was one month old and that the absence of visitation has, in part, resulted in it being in the [C]hild's best interest that termination take place in this case. The fourth factor, whether a meaningful relationship has otherwise been established between the parent and the [C]hild, is very significant in this case. The [C]hild has not had any relationship with . . . [F]ather since she was one month old. The Court finds by clear and convincing evidence that there is no meaningful father-daughter relationship in this case. Based upon the lack of effort [Father] has made over the past five years to establish said relationship, this Court finds by clear and convincing evidence that it is in the best interests of the [C]hild that termination take place.

The fifth factor, the effect a change of caretakers and physical environment is likely to have on the [C]hild's emotional,

-18-

psychological and medical condition is important in this cause. The [C]hild has always resided in the home with . . . [Mother] and has not known . . . Father, who is, in effect, a stranger to her.

The Court has previously addressed the facts upon which the ninth factor is based. Father has not provided regular monthly support in any amount. Father is an able-bodied man and yet he chose to not pay child support on a regular basis.

The Court has carefully considered the nine factors above in determining whether there is clear and convincing evidence that termination of the parental rights of Father to the [C]hild is in the best interest of said [C]hild. The Court finds from the testimony of the witnesses, the exhibits entered into evidence and the record as a whole, that there is clear and convincing evidence that it is in the best interests of the [C]hild that the parental rights of . . . Father should be terminated. The Court finds by clear and convincing evidence that . . . [Father] has willfully failed to maintain regular visitation or other contact with the [C]hild, has not established a meaningful relationship with the [C]hild and, despite . . . [Mother] repeatedly asking . . . [F]ather for support, . . . [F]ather willfully failed to support the [C]hild.

In this manner, the trial court expressly considered all nine statutory factors and found three to be most relevant. In our view, the trial court properly relied upon Father's lack of visits or contact with the Child, his lack of a meaningful relationship with the Child, and his lack of support for the Child as the basis for its conclusion that termination was in the Child's best interest. We note that the court also considered factor (5) – the effect a change of caretakers and physical environment would likely have on the Child – and found it to be "important" to its decision. We would agree with the trial court's implicit finding that the remaining factors were simply not relevant or as relevant because this was not a case where Father was seeking custody of the Child or social service agencies were involved. As this Court has pointed out, the list "is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest." *See **In re Arteria H**.*, 326 S.W.3d 167, 182 (Tenn. Ct. App. 2010)(citing ***State v. T.S.W.***, No. M2001-01735-COA-R3-JV, 2002 WL 970434 (Tenn. Ct. App. M.S., filed May 10, 2002)). Finally, the court noted that as opposed to Father, Stepfather had developed a good relationship with the Child, provided for all her needs since marrying Mother, and desired to adopt her.

We are mindful that, in the end, the best interest of a child must be determined from

-19-

the perspective of the child and not the parent. ***Id.*** (citing ***White v. Moody***, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)). In the present case, Father professed that he "just wanted to be part of her life," but his actions over the nearly six years of the Child's young life did not match his words. Accordingly, we conclude that the trial court properly conducted its analysis in concluding that the termination of Father's rights is in the best interest of the Child.

VI.

The judgment of the juvenile court is affirmed. This case is remanded to the juvenile court, pursuant to applicable law, for enforcement of the court's judgment and for the collection of costs assessed below. Costs on appeal are taxed to the appellant, Philip C.

_____
CHARLES D. SUSANO, JR., JUDGE